IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


IRL S. BARG, et al.,                              :

              Plaintiffs,                          :

                    v.                             :        NO. 16-6049

ENCOMPASS HOME & AUTO                              :
INSURANCE COMPANY,
                                                   :
              Defendant.

### MEMORANDUM OPINION

In this action, Plaintiffs Irl S. Barg and Janet C. Walkow ("Plaintiffs") allege that

Defendant Encompass Home & Auto Insurance Company ("Defendant" or "Encompass")

breached its contractual obligations under a policy of homeowner's insurance it issued to them

by refusing to pay a claim relating to the leaking of heating oil from their furnace and that

Encompass did so in bad faith. Presently before this Court is Encompass's Motion for Summary

Judgment (Doc. No. 22). For the reasons discussed below, Defendant's Motion will be granted.

## I.      BACKGROUND

On or about June 9, 2016, Plaintiffs returned home after an extended absence and

discovered a strong odor. Compl. (Doc. No. 1) Ex. A ¶ 8; Mot. Ex. 1, at 17-18 (Deposition of Irl

S. Barg, June 19, 2017) [hereinafter "Barg Dep."]. Further examination revealed that oil had

spilled in the area of the oil tank and furnace and coated the floor in their basement. Barg Dep.

at 20-21. The parties agree that the oil spilled from a hole in the oil tank stored in the furnace

room of Plaintiffs' basement. Mot. at 3; Opp. (Doc. No. 24) at 1. The tank was approximately

30 years old. Barg Dep. at 9, 26; Mot. Ex. B, at 27 (Deposition of Luigi DeFilippo, Aug. 8,

2017). The parties concur that the hole in the furnace was caused by condensation that led to the

rusting of the oil tank. Mot. at 3; Opp. at 1. Plaintiffs hired J&J Environmental Services ("J&J") to perform clean-up and remediation. Mot. at 12; Opp. at 2.

At the conclusion of its remediation efforts, J&J issued a Cleanup Report to document its remediation activities. Mot. Ex. 6 [hereinafter "J&J Report"]. J&J estimated that 50 to 75 gallons of #2 heating oil had spilled from Plaintiffs' tank into their basement, impacting the concrete-floored utility room in which the tank was located as well as an adjoining finished recreation room. Id. at 1, 3. J&J set up a ventilation blower to "minimize fuel oil vapors entering the upper floors." Id. at 2. When that blower proved insufficient, it replaced the blower with a more powerful blower. Id. J&J removed the cement floor from the utility room as well as a portion of the floor from the recreation room and sill boards and the base of studs impacted by the oil. Id. at 2-3. J&J also removed impacted stone and soil from under the rooms as well as from adjacent areas. Id. at 3-4. J&J remediated further by washing affected walls and footers as well as the walls and floors of the excavation with a hydrogen peroxide solution. Id. at 3-5. Multiple rounds of excavation, washing and retesting were required as J&J continued to obtain readings above the clean-up standards established by the Pennsylvania Department of Environmental Protection. Id. In total, J&J sent 13.8 tons of contaminated soils and concrete to Clean Earth of Philadelphia for "disposal/recycling." Id. at 4. Testing of the excavated soil established that it contained the following chemical compounds: ethyl benzene, isopropyl benzene, naphthalene, toluene, 1,2,4 trimethylbenzene and 1,3,5 trimethylbenzene. J&J Report, Chart 1 (documenting that the soil contained these substances). During the filling of the excavation, J&J installed vapor extraction piping.[1] J&J Report at 5.

---

[1]     Plaintiffs assert that they dispute whether oil leaked into the soil beneath their house. Opp. at

(Footnote continued on next page)

Plaintiffs filed a claim with Encompass under their homeowner's insurance policy seeking reimbursement for the costs of the remediation.  Compl. ¶ 10.  Encompass denied Plaintiffs' claim citing several policy provisions that it asserted excluded the claim from coverage.  Id. ¶ 11.  The exclusion provision that is disputed for the purposes of the present Motion is the pollution exclusion.[2]

## II.    <u>SUMMARY JUDGMENT STANDARD</u>

Under the well-established summary judgment standard, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  <u>Williams v. Wells Fargo Bank</u>, No. 14-2345, 2015 WL 1573745, at *3 (E.D. Pa. Apr. 9, 2015) (quoting <u>Wright v. Corning</u>, 679 F.3d 101, 105 (3d Cir. 2012)).

> [T]he plain language of Rule 56[a] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving

7. However, given that they have not presented or identified any evidence to contradict the rather convincing evidence provided in the report of their own environmental remediation contractor, that assertion is meaningless.  <u>See</u> <u>Burton v. Teleflex Inc.</u>, 707 F.3d 417, 425 (3d Cir. 2013) ("to survive summary judgment, a plaintiff must present evidence on which the jury could reasonably find for the [non-moving party]" (internal quotation marks omitted)).

[2]    Encompass contended in its Motion that the claim also was excluded under the homeowner's insurance policy's exclusion for "wear and tear, rust and corrosion," Mot. at 9-11, but it withdrew that claim at oral argument, choosing instead to rely solely on its argument that coverage was barred under the pollution exclusion provision.

party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of [his or] her case with respect to which [he or] she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

"By its very terms, this standard [that there be no genuine issue as to any material fact] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). A material fact is one that "might affect the outcome of the suit under the governing law." Id. at 248.

When ruling on a motion for summary judgment, the court shall consider facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 538 (3d Cir. 2006). To prevail on summary judgment, however, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-moving party].'" Burton, 707 F.3d at 425 (quoting Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007)); see also Anderson, 477 U.S. at 252.

## III.    DISCUSSION

### A.    Pennsylvania Law Governing the Interpretation of Insurance Policies[3]

Insurance policies must be interpreted under ordinary principles of contract law. N. Am. Dealer Co-op v. Interstate Indem. Co., 180 F. App'x 326, 329 (3d Cir. 2006); Curtis v. Cincinnati Ins. Co., No. 1150 WDA 2012, 2013 WL 11261850, at *3 (Pa. Super. Ct. June 20,

---

3    It is not disputed that Pennsylvania law applies to this case.

4

2013). The Pennsylvania Supreme Court has summarized those principles as they apply to insurance policies as follows:

> [T]he task of interpreting [an insurance] contract is generally performed by a court rather than by a jury. The goal of that task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument. Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language.
>
> Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This is not a question to be resolved in a vacuum. Rather, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. We will not, however, distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity.

Madison Const. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999) (internal quotation marks and citations omitted). Where, as here, an insurer relies on an exclusion contained in its policy, the insurer bears the burden of proving that the exclusion applies. Id.

## B. **The Disputed Policy Provisions**

Encompass insured Plaintiffs pursuant to a policy entitled "Deluxe—Home—Pennsylvania" and issued on its form "G1-72411-A Ed. 02-07" (the "Policy"). Mot. Ex. 4. The Policy included the following relevant exclusion to its coverage for real property:

**LOSSES WE DO NOT COVER**

> We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.
>
> . . .
>
> 2. **Real Property, We** do not insure for loss:
>
> . . .
>
> d. Caused by the following:
>
> . . .

7.  Discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a **Tangible Personal Property—Covered Peril.**

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalls [sic], chemicals and waste whether man-made or natural.  Waste includes materials to be recycled, reconditioned or reclaimed.

. . .

Under exclusions 2.a., 2.b., 2.c., and 2.d., any ensuing loss from a covered peril to covered property not excluded or excepted in this policy is covered.

Id. at 14-16 (emphasis in original).

### C.    Encompass Has Met Its Burden of Showing That the Damages to Plaintiffs' Home Caused by the Heating Oil Are Not Covered Under Its Policy

The Policy does not specifically define heating oil or petroleum products—or any other substance, for that matter—as pollutants, but instead contains only the definition of the term "pollutants" set forth above.  Plaintiffs contend that, as a result, the Policy is ambiguous as to whether heating oil constitutes a pollutant for the purposes of the Policy's pollution exclusion. The Pennsylvania Supreme Court articulated the analysis to be applied in determining whether a substance is subject to a pollution exclusion in Madison—a case involving an exclusion containing essentially the same language as the exclusion in the Policy. 735 A.2d at 103.  The court held that the determination of whether the term "pollutant" is ambiguous is to be made by focusing on the specific substance at issue in the case.  Id. at 107.  In that case, the record contained a Material Safety Data Report ("MSDR") from the manufacturer of the product at issue, which was called Euco Floor Coat.  Id.  The court noted that the MSDR showed that the product included chemicals that were considered toxic or carcinogenic or that had been classified as hazardous air pollutants by the federal government.  Id.  The MSDR warned that users of the product should wear protective clothing to avoid contact of the product with the skin, that vapors

from the product would be "irritating" and that overexposure to them could cause injury.  Id.

The court held that the product was unambiguously an irritant and, therefore, that the pollution

exclusion applied to it.  Id.

     In arguing that the pollution exclusion does not apply here, Plaintiffs rely on Whitmore v.

Liberty Mut. Fire Ins. Co., in which the court held that a heating oil spill was not subject to a

pollution exclusion.  No. 07-5162, 2008 WL 4425227, at *6 (E.D. Pa. Sept. 30, 2008).

Whitmore, however, was decided on summary judgment on a record that did not contain "any

product report, expert opinion, or other source of information to show or even argue that home

heating oil [was] a 'pollutant' within the policy's pollution exclusion."  Id. at *4.  The court

explained that "because the record before the Court [in that case] d[id]not contain any

information about the specific product, the Court c[ould] look to state and federal governmental

statutory definitions to determine whether or not heating oil [was] a pollutant under the pollution

exclusion clause at hand."  Id. at *5.  The court examined the treatment of heating oil under the

Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C.

§ 9601(33), the Clean Water Act, 33 U.S.C. § 1362, the Oil Pollutants Act, id. § 2701, the

Pennsylvania Hazardous Sites Cleanup Act, 35 Pa. Cons. Stat.  § 6020.103, and the Pennsylvania

Storage Tank and Spill Prevention Act, id. § 6021.103 (the "Storage Tank Act"), as well as

dictionary definitions, to determine whether heating oil constituted a pollutant for the purposes of

the plaintiffs' policy.[4]  Id.  It held that the heating oil spill in that case was not subject to the

---

[4]    The Whitmore court relied on Atlantic Cas. Ins. Co. v. Epstein, No. 03-6506, 2004 WL
2075038, at *5 (E.D. Pa. Sept. 15, 2004), which also considered whether a heating oil spill was
subject to a pollution exclusion on summary judgment on a record devoid of any information
regarding the chemical composition or properties of heating oil.  Whitmore, 2008 WL 4425227,
at *5.  In the absence of such evidence, the Epstein court had looked to regulatory and dictionary

(Footnote continued on next page)

pollution exclusion because, on the limited evidentiary record before it, the insurer had failed to

carry its burden to show that heating oil was a pollutant.  Id. at *6.

     Unlike the record in Whitmore, the record here includes considerable relevant evidence

on which to interpret and apply the Policy's terms.  The Policy provides that the pollution

exclusion applies to "contaminants."  Mot. Ex. 4, at 16.  A contaminant is defined as "something

that contaminates."  Merriam Webster.com (Merriam Webster, 2011), https://www.merriam-

webster.com (last visited Jan. 19, 2018).  Contaminate is defined as:

> 1a: to soil, stain, corrupt, or infect by contact or association
>
>  b: to make inferior or impure by admixture
>
> 2: to make unfit for use by the introduction of unwholesome or
> undesirable elements

Id.

     In interpreting the Policy terms at issue here, "[t]he polestar of our inquiry . . . is the

language of the insurance policy."  Madison, 735 A.2d at 106.  That language should be given its

---

definitions and concluded that the insurer had failed to meet its burden to prove that the pollution
exclusion applied.  2004 WL 2075038, at *3-5.

    While the Whitmore and Epstein courts were limited by the absence of evidence in the
records before them, the fact that a substance is not regulated by some environmental statutes or
is regulated only under some circumstances by others is of little evidentiary value.  When
environmental statutes or regulations treat a substance as a pollutant, they provide strong
evidence that the substance is in fact a pollutant.  See Madison, 735 A.2d at 107.  In contrast, the
fact that such authorities do not regulate a substance may well reflect policy or political
considerations that have little to do with the inherent nature of the substance at issue.  For
example, although the Storage Tank Act defines petroleum, including fuel oil, as among the
substances that "may present substantial danger to the public health, welfare or the
environment," it expressly excludes from the provisions governing above ground storage tanks
any tank that is "used for storing heating oil for consumptive use on the premises where stored."
35 Pa. Cons. Stat. § 6021.103.  The exclusion of such oil from the statute's requirements does
not reflect any difference in its chemical properties or dangers than those of fuel oil used for
other purposes.

common, ordinary meaning, <u>Ricio v. Am. Republic Ins. Co.</u>, 705 A.2d 422, 426 (Pa. 1997), and

is to be interpreted on the basis of the particular set of facts presented, <u>Madison</u>, 735 A.2d at 107.

Unlike in <u>Whitmore</u>, the record here presents more than sufficient evidence to allow the Court to

apply the pollution exclusion to the facts of this case based on the common, ordinary meaning of

the Policy's terms.

The record contains extensive evidence that heating oil is a contaminant.  Plaintiffs

engaged the services of an environmental services firm, rather than an ordinary construction

contractor, to remediate the oil spill.  <u>See</u> Mot. at 2-3; Opp. at 4.  That firm performed testing to

identify the portions of the basement and of the underlying and surrounding soil that were

impacted by using a photoionization detector ("PID").[5]  J&J Report at 3.  Based on that testing,

J&J found it necessary to remove 13.8 tons of impacted concrete and soil in order to meet the

Pennsylvania Department of Environmental Protection's standards for #2 fuel oil in soils.  <u>Id.</u> at

4.  It also removed sill boards and portions of studs that the oil had impacted.  <u>Id.</u> at 3.  Rather

than disposing of those materials in a landfill or using them for backfill, J&J shipped them to

Clean Earth of Philadelphia for disposal/recycling.  <u>Id.</u> at 4.  Although there is no evidence in the

record to show what the recycling entailed, it is reasonable to infer that it involved separating the

oil from the soils.  J&J repeatedly washed remaining portions of the structure with a hydrogen

peroxide solution where PID readings indicated the presence of the oil.  <u>Id.</u> at 3-4.  Testing of the

soils and other materials removed from Plaintiffs' home revealed that they were contaminated by

---

[5]    A photoionization detector is a "device[] that can rapidly detect volatile organic compounds
and other chemicals in parts per million and parts per billion concentration ranges.  Responders
often mount handheld PIDs to remotely operated vehicles for plume mapping or collecting data
prior to their entry into a spill area."  Dept. of Homeland Sec., <u>Handheld Photoionization
Detectors</u>, (April 1, 2014), https://www.dhs.gov/publication/handheld-photoionization-detectors.

substances recognized as pollutants. Compare Mot. Ex. 6, Chart 1 (documenting that removed

materials contained ethyl benzene, isopropyl benzene, naphthalene, toluene, 1,2,4

trimethylbenzene and 1,3,5 trimethylbenzene) with Heri Krupa, Inc. v. Tower Grp. Cos., No. 12-

4386, 2013 WL 1124401, at *5 (E.D. Pa. Mar. 18, 2013) (finding that a pollution exclusion

applied because soil had been contaminated with 1,2,4 trimethylbenzene and naphthalene);

United States v. Union Gas Co., 586 F. Supp. 1522, 1523 (E.D. Pa. 1984) (stating that

naphthalene and ethylbenzene are toxic pollutants); 40 C.F.R. § 116.4 (identifying naphthalene

as a hazardous substance); id. § 401.15 (identifying ethylbenzene, naphthalene and toluene as

toxic pollutants ); see also Madison, 735 A.2d at 107 (determining that the spilled substance was

a pollutant by examining the characteristics of its constituent chemicals). Plaintiffs have alleged

that the oil spill caused them damages of more than $50,000 to remediate, including costs for

"design services, cleanup and remediation of the non-soil parts of the structure." Compl. ¶ 15. It

is evident that contact with the oil rendered the Plaintiffs' concrete, building materials and soil

"unfit for use by the introduction of unwholesome or undesirable elements."[6] Merriam

Webster.com (definition of "contaminate").

 Plaintiffs argue, nevertheless, that even if the pollution exclusion applies, they are

entitled to coverage under the Policy provision regarding "ensuing loss." Opp. at 5-6. The

ensuing loss provision, however, provides coverage only to "ensuing loss from a covered peril."

As explained above, contamination by a leak of heating oil is not a covered peril. Plaintiffs'

argument essentially amounts to the assertion that, although the oil itself was subject to the

---

[6]   In addition, the evidence also reflects that the spilled oil produced vapors. J&J initially used blowers to vent the vapors, J&J Report at 2, and ultimately installed vapor extraction piping when it filled the hole left by the excavation, id. at 5. Vapors are included in the Policy's

(Footnote continued on next page)

exclusion, the ensuing damage to their home, and to the underlying soils from being contaminated by the oil is covered.  See id. at 6-7.  Such an interpretation "would render the policy exclusions virtually meaningless.  That is, the 'exception to [the] . . . exclusion cannot be construed so broadly that the rule (the exclusion) is swallowed by the exception.'  Rather the ensuing loss provisions are best read as permitting recovery where a covered peril or damage results from [a covered peril]."  GTE Corp. v. Allendale Mut. Ins. Co., 372 F.3d 598, 614 (3d Cir. 2004) (quoting Swire Pac. Holdings, Inc. v. Zurich Ins. Co., 139 F. Supp. 2d 1374, 1381 (S.D. Fla. 2001)); see also Smith v. Westfield Ins. Co., No. 06-3077, 2007 WL 1740816, at *2 (E.D. Pa. June 15, 2007) (holding that ensuing loss provision could not extend to loss ensuing from a cause excluded from the policy); Banks v. Allstate Ins. Co., No. 91-6982, 1993 WL 40113, at *5 (E.D. Pa. Feb. 12, 1993) (stating that an ensuing loss provision "cannot re-insert an excluded peril into the Policy").  "The ensuing loss provision does not provide coverage for excluded losses; it provides coverage for certain secondary losses ultimately caused by excluded perils."  Myung Sung, Inc. v. Firstline Nat. Ins. Co., No. 95-2663, 1996 WL 57937, at *2-3 (E.D. Pa. Feb. 12, 1996).  Thus, for example, if the oil or its vapors caused a fire or an explosion, the loss from the fire or explosion would be covered, even though the oil contamination itself was not.  Here, the loss Plaintiffs suffered was not a secondary loss, but was the contamination of their property by the leaking heating oil.  Therefore, the ensuing loss provision provides no basis on which Plaintiffs can turn the excluded loss into a covered one.[7]

---

definition of a pollutant.  Mot. Ex. 4, at 16.

[7]    Plaintiffs make passing reference, without citation, to the part of Whitmore's analysis in which the court determined that heating oil had to be released into the environment to meet the definition of a pollutant.  See Opp. at 7; Whitmore, 2008 WL 4425227 at, *6.  The Whitmore court only reached that conclusion because, in the absence of relevant evidence in the record, it

(Footnote continued on next page)

## IV.    CONCLUSION

For the reasons set forth herein, this Court finds that damages resulting from the

Plaintiffs' heating oil spill are excluded from coverage by the Policy's pollution exclusion.

Accordingly, Defendant's Motion will be granted.[8]  An appropriate Order follows.


Dated:  January 19, 2018



BY THE COURT:




*/s/ Marilyn Heffley*
MARILYN HEFFLEY
UNITED STATES MAGISTRATE JUDGE

---

resorted to applying the definitions of pollutant taken from the Clean Water Act and the Oil Pollution Act, which it found "address oil as a pollutant and contaminant solely in relation to water."  2008 WL 4425227, at *6.  In this case, however, the record contains the necessary evidence to allow for the application of the plain meaning of the exclusion's terms.  As the Pennsylvania Supreme Court has instructed, "[t]he polestar of our inquiry . . . is the language of the insurance policy."  Madison, 735 A.2d at 106.  "If the pollution exclusion clause, by its express terms, does not require that a discharge or dispersal be 'into the environment' or 'into the atmosphere,' then the court is not at liberty to insert such a requirement in order to effect what it considers to be the true or correct meaning of the clause. The court's only aim, as noted earlier, must be 'to ascertain the intent of the parties as manifested by the language of the written instrument.'"  Id. at 108 (quoting Gene & Harvey Builders, Inc. v. Pa. Mfrs. Ass'n Ins. Co., 517 A.2d 910, 913 (Pa. 1986); Standard Venetian Blind Co. v. Am. Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983)).

[8]    In Count II of their Complaint, Plaintiffs have asserted that Encompass denied their claim in bad faith.  A bad faith claim requires that an insurer have committed a "frivolous or unfounded refusal to pay the proceeds of a policy."  Terletsky v. Prudential Prop. & Cas. Ins. Co., 649 A.2d 680, 688 (Pa. 1994).  Because Encompass's denial of Plaintiffs' claim was not frivolous or unfounded, Plaintiffs' bad faith claim must fail and will be dismissed on summary judgment.